PRESENT:  All the Justices

IN RE: COREY HARGROVE, A/K/A
COREY JERMAINE HARGROVE, PETITIONER

Record No. 240316

OPINION BY
JUSTICE THOMAS P. MANN
DECEMBER 18, 2025

UPON A PETITION FOR A WRIT OF ACTUAL INNOCENCE

In 1991, a jury found Corey Hargrove guilty of the rape, sexual abuse, and abduction of Saphonia Woolridge.  The circuit court sentenced Hargrove to 50 years' imprisonment.  Over three decades later, Hargrove petitions this Court for a writ of actual innocence under Code § 19.2-327.2 *et seq.*  He contends that his innocence is established by the absence of his DNA from the victim's underwear, as well as non-biological evidence that purportedly undercuts the victim's credibility.  We find that Hargrove fails to show, by a preponderance of the evidence, that no rational factfinder would have found him guilty beyond a reasonable doubt.  For the reasons below, we conclude that Hargrove is not entitled to the relief sought and the Commonwealth's motion to dismiss is granted.

## I.  BACKGROUND

### A.  June 17, 1990 Rape

At Hargrove's jury trial, Woolridge testified to the following facts.

Woolridge recalled that she heard footsteps behind her as she walked home on the afternoon of June 17, 1990.  Woolridge, who was 22 at the time, turned around to find a teenage boy.  He asked if she had seen two other boys who passed her earlier.  She said she saw them go under a nearby bridge.

The teen—who Woolridge believed to be about 15 or 16 years old—kept following her. She asked him "what the problem was." "Nothing," he replied. He walked close enough behind her that she could feel his breath. Woolridge turned around. He denied that he was following her.

She continued on, but the teen then hit her in the head with a stick and grabbed her around the neck. Woolridge fell to the ground on a football field outside a middle school. Her assailant dragged her across the field and a track, then over a grassy area and into the woods.

As Woolridge lay on the ground, the attacker attempted to pull her pants down. She recounted the following:

> [H]e was playing – trying to pull my pants down, my shorts down and my underwear. After he got those down about half way to my knees he kept playing, with me with my vagina with his fingers and he stuck his fingers. … In my vagina.

He then turned Woolridge over onto her stomach, laid on top of her, and penetrated her vagina with his penis. Woolridge was unsure if her attacker ejaculated.

The assailant got up and told Woolridge she could leave. Woolridge testified that he "looked kind of crazy when he said it, like he was scared nervous or something." She estimated that her encounter with the attacker, starting from the time he approached her, lasted about 45 minutes.

Woolridge immediately sought medical care at Stuart Circle Hospital.

**B. PERK Collection**

Dr. Dale Slagel, assisted by registered nurse Denise Kern, collected evidence from Woolridge for a physical evidence recovery kit ("PERK"). This kit included thigh/vulva and vaginal smears, corresponding swabs, pubic combings, and Woolridge's underwear.

Nurse Kern testified at trial that Woolridge was quiet, appeared scared, and wanted her mother nearby. She added that Woolridge had a small abrasion on one of her arms and a fracture to her right ankle.

Law enforcement also responded to the hospital. Woolridge, who did not know her assailant, provided a physical description. John Larson, a detective with the Richmond Bureau of Police, testified that he collected the PERK, stored it in a refrigerator at the police department property section, and then submitted it to the state laboratory.

On January 22, 1991, the Division of Forensic Science's Northern Laboratory issued a Certificate of Analysis. The examiner detected no spermatozoa on the thigh/vulva and vagina smears, nor any seminal fluid on the swabs and underwear. The examiner, however, identified "[h]airs and/or fibers" in Woolridge's pubic combings and underwear. Accordingly, the certificate noted that "[h]air comparisons can be done if head and pubic hair samples from the suspect are submitted to the laboratory along with this item." The examiner also identified blood on the swabs and underpants. (Although another DFS record indicates that Woolridge was menstruating at the time of the rape.)

## C. Identification of Hargrove

Woolridge initially thought that the assailant may have been the brother of an acquaintance, although she did not share her hunch with police. Woolridge did not personally know the brother and had seen him only once. She confided in a friend about her suspicions. When the friend showed Woolridge a photograph of the possible suspect, Woolridge realized she was mistaken.

Woolridge testified that she saw her assailant twice after the attack.

3

Five or six months after the rape, she saw him sitting on the steps of her apartment building. She entered her home and called the police, but they could not find him.

Woolridge saw him again about a year after the attack. She was with her fiancé, sitting on the steps of his apartment building, when she saw the attacker walking towards her. He was going to a different unit at the building. After Woolridge recognized his face, she told her fiancé that the individual was the one who assaulted her, and they called the police. This time, officers located and arrested the individual, who was identified as 16-year-old Corey Jermaine Hargrove. Hargrove denied raping Woolridge.

The Juvenile and Domestic Relations Court for the City of Richmond issued a detention order the same day. The court appointed an attorney for Hargrove and transferred the case to the Circuit Court.

On June 3, 1991, a grand jury indicted Hargrove on a charge of rape. About a month later, on July 1, 1991, a grand jury also indicted Hargrove on abduction and sexual abuse charges. After Hargrove's arrest, Detective Larson collected hairs and a blood sample from him. Detective Larson then submitted Hargrove's physical evidence and Woolridge's PERK to DFS for further analysis. The DFS Western Laboratory analyzed the material and issued a Certificate of Analysis shortly before trial. The analyst concluded that "[n]o apparent foreign hairs were found in the 'hairs and/or fibers' from the pubic combings or underpants" collected from Woolridge. The parties later agreed at trial that this meant the laboratory did not identify hairs from anyone other than Woolridge herself. Thus, DFS did not identify any links between Hargrove and Woolridge's PERK.

## D. Trial and Conviction

At Hargrove's jury trial, the Commonwealth called three witnesses: Woolridge, Nurse Kern, and Detective Larson. The defense did not call any witnesses.

Woolridge testified that she was certain Hargrove was her attacker. She recalled seeing his face throughout her entire encounter with him and what she described as unforgettable "big poppy eyes." Woolridge described how her assailant's face was, in essence, seared into her memory: "I see his face every night, every night; every time I close my eyes I see his face." When the prosecutor asked Woolridge about her level of certainty in her identification given that a year had passed since the rape, Woolridge reiterated, "[e]very time I close my eyes I see him. It's really stuck in my mind those eyes."

Although Woolridge was certain about her identification, the two DFS certificates— which were introduced into evidence at trial—did not establish a biological link between Hargrove and the physical evidence collected from Woolridge. At trial, the prosecutor stated the following to the jury:

> The two lab reports that were submitted into evidence have certain information on them, which you will be reading when you're in the back. The defense and the Commonwealth have agreed to stipulate that the word [']foreign['] in the lab report dealing with the hairs means that the hairs do not belong -- that the hairs belong not to Saphonia Woolridge. So, foreign hairs would be someone else's hair than her's [sic]; and there were no foreign hairs found. And also the absence of spermatozoa, seminal fluid and foreign hair prevented the lab from performing any other tests to determine the identity of the offender.

Before closing arguments, Hargrove's attorney moved to strike and dismiss on the basis that a jury could only convict her client out of sympathy for Woolridge. Defense counsel argued that Woolridge's credibility was questionable "because she originally thought that it was someone else who had hurt her" and that her testimony emphasized the attacker's "big poppy

5

eyes," which was not part of her initial description to police following the attack. The circuit court denied the motion.

Despite the lack of physical evidence, the jury ultimately found Hargrove guilty of abduction, aggravated sexual battery, and rape.[1]

At sentencing, the circuit court imposed 50 years' incarceration for the rape conviction and suspended sentencing for the sexual abuse and abduction convictions. The sentence was to run consecutively to another 50-year sentence imposed in a separate case in which Hargrove pleaded guilty to charges of rape and burglary involving a different victim.[2]

Hargrove's direct appeals to the Court of Appeals and this Court were unsuccessful.[3]

Woolridge died in 1997.

---

[1] When the jury first rendered its verdict, defense counsel asked the circuit court to poll the twelve jurors. The first eleven stated "yes" when asked if it was their verdict, but the twelfth stated, "with reservation." When the circuit court asked for clarification on whether it was, in fact, her verdict, the juror replied, "I guess so." The circuit court then directed the jury to continue its deliberations until it could reach a unanimous decision. Fourteen minutes later, the jury returned to the courtroom and the twelfth juror affirmed that she believed Hargrove was guilty on the three charges. The juror briefly explained why she was initially hesitant: "I have seen people who have been a victim because of identification, and then years later they have proven innocent, that bothers me." Nevertheless, she was convinced of Hargrove's guilt.

[2] Sentencing for both cases occurred at the same hearing on August 7, 1991.

[3] Hargrove later moved to set aside his conviction on the ground that the juvenile court had failed to notify his biological father of its transfer proceedings. Finding "no merit" to the claim, the circuit court denied the motion on May 29, 2001. Hargrove filed a notice of appeal but then moved to withdraw it. The Court of Appeals granted the motion. Hargrove also filed, pro se, a petition for a writ of actual innocence in January 2004. This Court found that Hargrove failed to state a claim and dismissed the petition.

**E. Post-Conviction DNA Testing[4]**

In 2023, Hargrove filed an unopposed motion in the Circuit Court for the City of Richmond for scientific analysis of previously untested evidence under Code § 19.2-327.1(A). Hargrove asked the circuit court to order DFS to conduct post-conviction DNA testing. His motion explained how advancements in DNA testing, particularly with respect to Touch DNA, Short Tandem Repeat ("STR")[5], and Y-Short Tandem Repeat ("Y-STR")[6] testing, were not used by DFS at the time of Hargrove's conviction, had not been applied to the biological evidence in his case, and could provide new insights into genetic material that may have been left on the PERK collected from Woolridge. Hargrove alleged that the Richmond Police Department retained the PERK after the trial through August 2022, when it sent the kit to DNA Labs International ("DLI"), a private laboratory in Deerfield Beach, Florida, as part of Virginia's Sexual Assault Kit Initiative. When Hargrove filed his motion, DLI had not yet tested the kit. The circuit court granted the motion.

---

[4] Hargrove unsuccessfully sought DNA testing at various points between 2003 and 2008. But more recently, he obtained DNA testing and now relies on those results in his petition.

[5] "STR … refers to segments of the genomic strand where known (short) sequences repeat themselves a number of times. As a result, even small or degraded samples of DNA may still retain intact STR sites where a longer VNTR ["variable number tandem repeat"] might have broken down. When combined with [polymerase chain reaction], which allows an analyst to confidently amplify even a small amount of genetic material … it is thus possible to retrieve results in a broader number of cases." David L. Faigman et al., Modern Scientific Evidence: The Law and Science of Expert Testimony § 30:2 (2024-2025 ed.)

[6] "Y-STR testing amplifies 'male DNA components over female DNA, which may be in excess in biological samples recovered in sexual assault cases.'" *In re Brown*, 295 Va. 202, 218 n.16 (2018) (citing John M. Butler, Advanced Topics in Forensic DNA Typing: Interpretation 134 (2015)).

At some point after filing his testing motion, Hargrove learned that DLI had, in fact, tested the biological material. In a Certificate of Analysis dated May 8, 2023, DLI reported that no male DNA was detected on vaginal, saliva, thigh, and vulva swabs, nor was any detected on the underwear. DLI reported that "[n]o male DNA was detected on the staining on the interior crotch region of the underwear; therefore, no further analysis was performed." The laboratory performed no analysis on other evidence collected from Woolridge, such as pubic hair, thigh and vulva slides, and a comb. DLI used a "real-time Polymerase Chain Reaction (PCR) quantitation kit" called "PowerQuant," which "targets total human and total male [DNA] as well as assesses DNA degradation."

Hargrove then returned to the circuit court with an unopposed motion for state funding of scientific testing at a different facility. His motion summarized DLI's results and noted that DLI's method is the same that DFS "currently employs to detect/collect male DNA, so it is not likely that testing by DFS will yield any substantive results." He further asserted that "newer methods of DNA collection, namely the M-Vac system" offered a more advanced means of sampling DNA than more traditional approaches.[7] Hargrove reported that DFS does not yet use M-Vac technology but that the Richmond, California-based Serological Research Institute ("SERI") does. Hargrove and the Commonwealth agreed upon SERI under Code § 19.2-327.1(E)(1). The circuit court granted the unopposed funding request on August 28, 2023.

SERI issued its "Evidence Examination Report" on February 14, 2024. SERI, like DLI, recovered no male DNA from swabs taken of Woolridge's thigh, vulva, and vagina. But unlike earlier testing, SERI identified a "weak and incomplete DNA mixture" from portions of the underwear.

---

[7] M-Vac is a "wet vacuum DNA collection tool." *In re Phillips*, 296 Va. 433, 441 (2018).

8

The laboratory made three findings about the mixture. First, it "was interpreted as originating from three contributors with at least one male and one female, but without a discernible major contributor." Second, Woolridge was most likely one of those contributors.[8] And third, Hargrove was excluded as a contributor to the mixture.

Gary Harmor, SERI's chief forensic DNA analyst, wrote in a subsequent email to Hargrove's counsel that his laboratory used the M-Vac method "to sample the outside and inside surfaces of the panties," except for the crotch, and that he had "no way of telling the nature of the cells collected."[9] Harmor clarified that the crotch was not tested because it "was very blooding [sic] and with added vaginal secretions would have overwhelmed the [polymerase chain reaction] with [the] victim's DNA and we would have had to use YSTRs, not autosomal STRs." In other words, Woolridge's DNA would have made it difficult to identify genetic material from other contributors and the laboratory would have needed to use a method that specifically targets male DNA.

## F. Petition for Writ of Actual Innocence

On April 12, 2024, Hargrove filed the instant petition for a writ of actual innocence based on biological evidence. He contends that the absence of his DNA from Woolridge's underwear (and the presence of foreign male DNA) exonerates him of the rape. He also argues that Woolridge's trial testimony had several "flaws and inconsistencies" that rendered it unreliable.

---

[8] The SERI report explained that "[t]he DNA results are at least 29 million times more likely if they originated from Saphonia Woolridge … and two unknown, unrelated contributors than if they originated from three unknown, unrelated contributors. This likelihood ratio provides very strong support for the inclusion of Saphonia Woolridge to this mixture."

[9] Hargrove attached this email correspondence to his petition but otherwise provided no formal affidavit to explain the results.

To this end, Hargrove presents non-biological evidence in the form of a signed declaration from Woolridge's ex-husband, who alleges that Woolridge suffered from mental and physical health issues, including uncontrolled diabetes. Hargrove also relies on purported scientific studies about the effects of diabetes on brain functioning and research about flaws in eyewitness identifications. He contends that the declaration[10] and scientific research show that Woolridge potentially suffered from cognitive impairments caused by uncontrolled diabetes or that her ability to accurately recall the rape was impaired by the passage of time and the highly stressful nature of the event.

The Commonwealth moved to dismiss the petition. It contends that Hargrove's petition failed to satisfy certain statutory requirements under Code § 19.2-327.3 and that the "weak and incomplete" DNA sample does not discredit Woolridge's testimony. The Commonwealth also argues that this Court cannot properly consider Hargrove's non-biological evidence in conjunction with an actual innocence petition based on biological evidence brought pursuant to Code §§ 19.2- 327.2 and 19.2-327.3. And even if this Court were to consider the non-biological evidence, the Commonwealth contends that it fails to establish that no rational trier of fact would convict Hargrove.

## II. ACTUAL INNOCENCE STATUTE

This Court has original jurisdiction to issue a writ of actual innocence based on biological evidence under Article VI, Section 1 of the Constitution of Virginia and Code § 19.2-327.2. At the outset, a petitioner must allege the following in his petition:

> (i) the crime for which the petitioner was convicted or the offense
> for which the petitioner was adjudicated delinquent;
> (ii) that the petitioner is actually innocent of the crime for which he

---

[10] The declaration is more fully explored below in the discussion of non-biological evidence.

was convicted or adjudicated delinquent;
(iii) an exact description of the human biological evidence and the scientific testing supporting the allegation of innocence;
(iv) that the evidence was not previously known or available to the petitioner or his trial attorney of record at the time the conviction or adjudication of delinquency became final in the circuit court, or if known, the reason that the evidence was not subject to the scientific testing set forth in the petition;
(v) the date the test results under § 19.2-327.1 became known to the petitioner or any attorney of record;
(vi) that the petitioner or his attorney of record has filed the petition within 60 days of obtaining the test results under § 19.2-327.1;
(vii) the reason or reasons the evidence will prove that no rational trier of fact would have found proof of guilt or delinquency beyond a reasonable doubt; and
(viii) for any conviction or adjudication of delinquency that became final in the circuit court after June 30, 1996, that the evidence was not available for testing under § 9.1-1104.

Code § 19.2-327.3(A). The petition must include "all relevant allegations of facts that are known to the petitioner at the time of filing," as well as "all previous records, applications, petitions, and appeals and their dispositions," and the results of any biological testing. Code § 19.2-327.3(B).

This Court may only grant relief "upon a finding by a preponderance of the evidence that the petitioner has proven all of the allegations" for elements iv through viii listed above[11] and "that no rational trier of fact would have found proof of guilt or delinquency beyond a reasonable doubt." Code § 19.2-327.5. The petitioner bears the burden of proof. *Id.*

The General Assembly recently amended the biological evidence actual innocence statute by lowering a petitioner's burden of proof from "clear and convincing evidence" to a "preponderance of the evidence."[12] 2020 Va. Acts chs. 993, 994. Still, this Court must assess the

---

[11] Element viii is inapplicable to these circumstances, but we address the other elements in the analysis below.

[12] A preponderance of the evidence is "the greater weight of all the evidence before the jury." *Smyth Bros.-McCleary-McClellan Co. v. Beresford*, 128 Va. 137, 156 (1920); *see also Rose v. Jacques*, 268 Va. 137, 149 (2004). "After the evidence has been weighed, [a] proposition

evidence in relation to whether a rational factfinder *would* convict the petitioner. Code § 19.2-327.5(A). Thus, we continue to "examine the 'probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial'" and "the likelihood of a reasonable juror finding the petitioner guilty beyond a reasonable doubt once all of the evidence has been fairly considered." *In re Watford*, 295 Va. 114, 124 (2018) (quoting *Schlup v. Delo*, 513 U.S. 298, 332 (1995)).

Even under a preponderance standard, the petitioner still faces a significant burden. "It is not enough for a petitioner to merely establish the existence of some conflicting evidence that introduces the possibility of reasonable doubt," nor is it sufficient to merely show "the theoretical possibility that a rational fact finder would choose to acquit." *Id*. The statute requires the petitioner to show, by a preponderance of the evidence, that "*no* rational trier of fact would have found proof of guilt … beyond a reasonable doubt." Code § 19.2-327.3(A)(vii) (emphasis added). In other words, the petitioner must prove that "*every* rational factfinder"—when presented with the totality of the evidence—would have acquitted the petitioner. *Tyler v. Commonwealth*, 73 Va. App. 445, 469 (2021) (discussing identical language in the statute governing actual innocence petitions based on non-biological evidence, Code §19.2-327.11(A)(vii)) (italics in original).

---

is proved by a preponderance of the evidence if it is made to appear more likely or probable in the sense that actual belief in its truth, derived from the evidence, exists in the mind or minds of the tribunal, notwithstanding any doubts that may still linger there." *Northern Va. Power Co. v. Bailey*, 194 Va. 464, 471 (1952) (quoting *Sargent* v. *Massachusetts Acci. Co.,* 29 N.E.2d 825, 827 (Mass. 1940)). A preponderance of the evidence "does not necessarily mean a greater number of witnesses." *Smyth Bros*., 128 Va. at 156. Indeed, "it is the quality, not the quantity, of the evidence which determines whether a particular standard of proof is met." *Gulfstream Bldg. Assoc., Inc. v. Britt*, 239 Va. 178, 184 (1990).

By contrast, "clear and convincing evidence" is "that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Brown*, 295 Va. at 227 (citation omitted). We noted in *Brown* that the clear and convincing standard is "considerably higher" than a preponderance standard. *Id*.

In assessing an actual innocence claim, Code § 19.2-327.5 requires this Court to consider "the petition, the response by the Commonwealth, previous records of the case, the record of any hearing held under this chapter and the record of any hearings held pursuant to § 19.2-327.1, and if applicable, any findings certified from the circuit court pursuant to § 19.2-327.4." We have described our inquiry as determining the probable outcome of "a hypothetical new trial in which a rational factfinder hears all of the evidence in the aggregate." *Watford*, 295 Va. at 125. And when "[s]itting as a court of original jurisdiction, this Court 'has the same authority to weigh and evaluate documentary and physical evidence as a trial court would have.'" *In re Scott*, 297 Va. 166, 186 (2019) (quoting *Haas v. Commonwealth*, 283 Va. 284, 292 (2012)).

### III. ANALYSIS

#### A. Biological Evidence

DNA testing is a powerful tool for establishing actual innocence long after a conviction. Genetic material can clarify the connections—or the lack thereof—between a defendant, a victim, and a crime scene. *See, e.g.*, *id.* at 189-90 (granting writ of actual innocence when DNA evidence showed petitioner was not the source of sperm found on rape victim's jeans or of male DNA found on vaginal swab from victim); *Grimm v. Commonwealth*, 81 Va. App. 74, 101–02 (2024) (granting actual innocence petition where new DNA evidence showed that hairs previously believed to link petitioner to victim did not come from the victim and that DNA on victim's autopsy swabs did not come from petitioner).

But this is not a case where the DNA evidence undercuts Hargrove's conviction. The results presented in Hargrove's petition are of scant value for several reasons.

First, we note that Hargrove meets his burden as to the first six elements provided in Code § 19.2-327.3(A). His petition identifies the crimes for which he was convicted, and he

13

contends that he is innocent of the offenses. He also describes the biological evidence at issue—DNA testing of evidence collected from Woolridge in 1990—and the method that SERI used to reach its results. Hargrove's counsel received the results on February 14, 2024, and timely filed the petition within 60 days.

The Commonwealth contends that Hargrove fails to satisfy Code § 19.2-327.3(a)(iv) because Hargrove did not explain in his petition why he failed to seek *any* DNA testing before trial. But Code § 19.2-327.3(a)(iv) is satisfied when a petitioner sufficiently sets out "the reason that the evidence was not subject to the scientific testing set forth in the petition." Here, Hargrove's petition and the record below establish that the specific methods SERI utilized—including M-Vac—were unavailable at the time of Hargrove's trial.[13] Additionally, the evidence was not tested in 1991 because both the defense and prosecution believed, as reflected by their stipulation at trial, that the limited evidence collected (i.e., evidence that did *not* show any semen or foreign hairs) would not yield new information if subject to further testing. Thus, in the context of available testing methods, it is understandable why the parties did not believe further testing would be fruitful.[14]

We now turn to examining the biological evidence.

_____

[13] Indeed, the Commonwealth's motion to dismiss acknowledges the "developments in Y-STR and touch DNA collection and analysis" that occurred after Hargrove's 1991 trial.

[14] The Commonwealth cites *Spencer v. Commonwealth*, 238 Va. 275 (1989) to suggest that Hargrove should have sought an unspecified form of DNA testing of Woolridge's biological samples. In *Spencer*, this Court recognized that DNA testing is a "reliable scientific technique" and affirmed a trial court's admission of DNA evidence. 238 Va. at 290. But *Spencer* was a rape and capital murder case in which the defendant left semen stains at the crime scene, which, in turn, were matched to his blood sample through a "DNA printing technique." *Id*. at 280. Here, there was no comparable biological specimen, like semen residue or foreign hair, from which the parties believed DNA could have been collected.

## 1. *Chain of Custody*

We must first satisfy ourselves that the chain of custody of the evidence is sound. Our case law underscores that the chain of custody is a critical consideration when reviewing scientific analysis of biological material long after initial collection. *In re Brown*, 295 Va. 202, 233 (2018).

In *Brown*, we noted that "[t]he burden is on the proponent of the evidence, when scientific analysis of a sample is offered, 'to establish each vital link in the chain of custody by showing the possession and handling of the evidence from when it is obtained to its presentation.'" *Id*. (quoting *Herndon v. Commonwealth*, 280 Va. 138, 143 (2010)). At the same time, "[w]here the possibility of contamination is mere speculation, the court should admit the evidence, and let any remaining doubt go to the weight of the evidence." *Id.* (quoting Charles E. Friend & Kent Sinclair, The Law of Evidence in Virginia § 16-7[b] at 1133 (7th ed. 2012 & Supp. 2017)).

The chain of custody rule ensures "that the exhibits at trial are the same and in the same condition as they were when first obtained." *Vinson v. Commonwealth*, 258 Va. 459, 469 (1999). This rationale is particularly critical in cases like this, where the biological evidence is decades old and has traveled to several different locations. Here, the relevant samples were, at various points, held at the Richmond Police Department, state laboratories in Fairfax County and Roanoke, and private laboratories in Florida and California. This Court needs to be assured that the biological evidence consists of the same material, in the same condition, as what was collected from Woolridge on June 17, 1990.

15

The parties' briefs did not specifically address the chain of custody.[15]  At oral argument, Hargrove's counsel suggested that any concern about the chain of custody was resolved by the circuit court when it granted Hargrove's motion for scientific analysis of the materials. Hargrove's counsel also argued that because the law creates a presumption that evidence is properly handled by public officials, any inference of contamination would place too heavy a burden on individuals bringing actual innocence petitions since they are not in the best position to "vouch for what happened" while the evidence was in the government's custody.

Hargrove is correct that presumptions of regularity apply in certain circumstances.

We have recognized that "[t]here is a presumption of regularity in the handling of exhibits by public officials." *Smith v. Commonwealth*, 219 Va. 554, 559 (1978) (quoting *United States v. Coades*, 549 F.2d 1303, 1306 (9th Cir. 1977)); *see also Gilmore v. Landsidle*, 252 Va. 388, 396 (1996) ("In the absence of clear evidence to the contrary, this Court must presume that a public officer has properly discharged his official duties."); *Branham v. Commonwealth*, 283 Va. 273, 282 (2012) (applying presumption of regularity to postal workers and unidentified DFS laboratory employees who retrieved a package from the mail and delivered it to an analyst for examination).

Furthermore, Code § 19.2-187.01 contains a "presumption" that DFS maintains a proper chain of custody when material is in its possession for laboratory testing. *Anderson v.*

---

[15] The Commonwealth suggests that the DNA mixture in Woolridge's underwear could have been the result of contamination due to the unknown number of individuals who have interacted with the samples at various sites.  Hargrove replies that the Commonwealth "offers no evidence, however, that the strict protocols in place regarding the handling of evidence were not followed here" and asserts that "[e]ach of the actors responsible for transporting the evidence in Mr. Hargrove's case were trained in handling evidence in criminal cases."  Thus, Hargrove contends that the Commonwealth's "unfounded suggestion would serve to undermine the value of physical evidence collected in all criminal cases."  Besides this exchange, the parties did not specifically grapple with chain of custody-related considerations.

*Commonwealth*, 274 Va. 469, 478-79 (2007). The statute specifically provides that "[a] report of analysis duly attested by the person performing such analysis or examination in any laboratory operated by … the Division of Consolidated Laboratory Services, the Department of Forensic Science or any of its regional laboratories, or by any laboratory authorized by such Division or Department to conduct such analysis or examination," or by various federal entities, is "prima facie evidence as to the custody of the material described therein from the time such material is received by an authorized agent of such laboratory until such material is released subsequent to such analysis or examination." Code § 19.2-187.01.

We also agree with Hargrove that certain information related to the chain of custody was presented in earlier proceedings. This is because when a convicted felon brings a motion in circuit court for scientific analysis of previously untested evidence, he must assert facts showing that "the evidence is subject to a chain of custody sufficient to establish that the evidence has not been altered, tampered with, or substituted in any way." Code § 19.2-327.1(A)-(B).

In his unopposed motion for scientific testing in the circuit court, Hargrove alleged facts about where the evidence had been stored since its initial collection. He noted that at trial, the Commonwealth "established an unbroken chain of custody of the victim's PERK kit and Mr. Hargrove's suspect kit" through Detective Larson's testimony, in which he stated that he received the PERK kit from a nurse at the hospital and then took the kit to Virginia's Division of Forensic Science for testing. Those results were provided in DFS certificates of analysis. Hargrove then reported "[u]pon information and belief" that the PERK kit was in the Richmond Police Department's possession between the trial and August 2022, when RPD sent the kit to DLI as part of Virginia's Sexual Assault Kit Initiative.

17

Hargrove did not allege facts in his motion regarding the conditions under which the evidence was stored or handled since its initial collection.[16] Still, he asserted that a "presumption of regularity" attaches to material in the possession of the Commonwealth's authorized agents.[17]

Even with the above background in mind, we observe that the existing record contains scarce information about the chain of custody beyond identifying where the evidence has been held. We know little about the conditions under which the evidence was stored and the precautions taken to protect its integrity. Hargrove leans on presumptions of regularity to fill these informational gaps. Assuming without deciding that these presumptions apply to the various entities that have handled the relevant biological evidence,[18] the record still raises red flags about potential contamination.

---

[16] Nor did Hargrove make any such allegations in his petition to this Court.

[17] Hargrove's testing motion stated that a presumption of regularity "attaches at the moment the material is received by an authorized agent of [the Commonwealth] until it is released after analysis." He cited *Dunn v. Commonwealth*, 20 Va. App. 217, 222 (1995) for this proposition. *Dunn*, however, did not address "authorized agents" in general. The decision refers to an "authorized agent" as the term is used in Code § 19.2-187.01, which creates a statutory presumption that enumerated entities, such as the Department of Forensic Science and federal agencies, maintain a proper chain of custody when materials are in their possession. The statute provides that "[a] report of analysis duly attested by the person performing such analysis or examination in any laboratory operated by" one of the listed entities "shall be prima facie evidence in a criminal or civil proceeding as to the custody of the material described therein from the time such material is received *by an authorized agent* of such laboratory until such material is released subsequent to such analysis or examination." Code § 19.2-187.01 (emphasis added).

[18] Although the parties have not addressed with any specificity which entities are covered by either statutory or common law presumptions of regularity, there are open questions about the applicability of these presumptions to the private laboratories.

In his motion for testing, Hargrove stated that DLI was an "authorized agent" of the Commonwealth and thus entitled to a presumption of regularity for chain of custody purposes. But as noted above in footnote 17, the case Hargrove relied on, *Dunn*, discusses a presumption of regularity in reference to laboratories operated by the entities listed in Code § 19.2-187.01. Nothing in the record clearly establishes that DLI is covered by Code § 19.2-187.01, which

First, the DLI results identified what appears to be a previously unknown hair on the thigh and vulva swabs. When DFS issued its first Certificate of Analysis of the PERK evidence and underwear in January 1991, the results stated that "[h]airs and/or fibers were noted in the victim's pubic combings and on the underpants." DFS made no mention of hairs or fibers on any other collected evidence. Then, after Detective Larson collected physical evidence from Hargrove, DFS compared it to Woolridge's PERK. The certificate of analysis issued in July

applies to laboratories operated by various federal agencies and "the [Virginia] Division of Consolidated Laboratory Services, the Department of Forensic Science or any of its regional laboratories, or by any laboratory authorized by such Division or Department to conduct such analysis or examination." And while "any laboratory that has entered into a contract with the Department of Forensic Science for the provision of forensic laboratory services shall be deemed authorized by the Department to conduct such analyses or examinations," Code § 19.2-187.01, nothing in the record establishes that DLI was in such a contractual relationship with DFS. Rather, Hargrove stated in his testing motion that "[a]ccording to DFS, *the Virginia Attorney General's Office contracts with DLI* for [Sexual Assault Kit Initiative] analysis as part of the program, and DLI then conducts analysis and forwards results for DFS to review." (emphasis added). Moreover, because DLI is a private laboratory, it is not obvious that the presumption of regularity accorded to public officials also applies to DLI personnel.

There is a similar question about whether a presumption of regularity applies to SERI, the second private laboratory that tested the biological evidence. Hargrove and the Commonwealth agreed upon SERI because it uses the M-Vac collection technique, yet nothing in the record shows that SERI was authorized by DFS to provide forensic laboratory services, nor are there allegations to support applying a presumption of regularity ordinarily reserved for public officials.

Although we acknowledge these questions about the applicability of presumptions of regularity to DLI and SERI, we decline to resolve them considering the limited record and lack of comprehensive briefing.

We also observe that, typically, a criminal defendant is in the position of challenging the chain of custody and the Commonwealth benefits from a presumption of regularity as applied to public officials. *See, e.g.*, *Branham v. Commonwealth*, 283 Va. 273, 281-82 (2012); *Smith v. Commonwealth*, 219 Va. 554, 557-59 (1978); *Robertson v. Commonwealth*, 12 Va. App. 854, 856-57 (1991). Here, the roles are reversed because the Commonwealth challenges biological evidence that may be subject to presumptions of regularity. We noted in *Brown* that a proponent of scientific testing of evidence bears the burden of establishing "each vital link in the chain of custody by showing the possession and handling of the evidence from when it is obtained to its presentation." 295 Va. at 233. But *Brown* did not address how that burden intersects with any applicable presumption of regularity and what burden the Commonwealth may face in challenging evidence that was within its own custody or at a lab with which it contracted for testing services. While these are important questions, we do not answer them today.

19

1991 concluded that "[n]o apparent foreign hairs were found in the 'hairs and/or fibers' from the pubic combings or underpants." And again, this certificate did not reference hairs on any other materials, like the swabs.

The more recent DLI Certificate of Analysis reported that "[n]o male DNA was detected" on the thigh and vulva swabs and thus "no further analysis was performed." Yet the laboratory also stated that "[n]o analysis was performed on an *apparent hair* observed on this item." (emphasis added). Because there is no record of a hair on these swabs in the earlier DFS analyses, the observation of a new "apparent hair" raises the specter of contamination of the biological evidence at some point between January 1991 and May 2023.

Second, the SERI testing of Woolridge's underwear found a "weak and incomplete DNA mixture" from three contributors, one of whom was likely Woolridge. Because Woolridge only testified as to one attacker, it is unclear who would have been the third contributor to the DNA mixture. This raises the possibility that at least one third party mishandled Woolridge's underwear around the time of the attack or that the garment was otherwise contaminated after its collection.

We recognize that these concerns about contamination are somewhat speculative. Still, these questions leap out from the pages of the record. Thus, even if the biological test results would be admissible at a hypothetical trial, these concerns go to the weight a factfinder would place on the evidence. *See Brown*, 295 Va. at 233. And, as discussed below, there are other reasons to question the significance of these test results.

### 2. *Hargrove Fails To Meet "No Rational Trier of Fact" Standard*

Hargrove needs to show by a preponderance of the evidence that "no rational trier of fact would have found proof of guilt or delinquency beyond a reasonable doubt." Code § 19.2-

327.3(A)(vii).  Even assuming that the DNA testing results would be admissible at a hypothetical trial, they do not help Hargrove meet this standard.

First, it is not entirely clear that DNA recovered from the underwear originated from the attack, nor can we assume that the assailant would have necessarily deposited his DNA on the garment.  Woolridge recounted at trial that while she was pushed to the ground and on her back,

> [H]e was playing – trying to pull my pants down, my shorts down and my underwear.  After he got those down about half way to my knees he kept playing, with me with my vagina with his fingers and he stuck his fingers. … In my vagina.

Based on this testimony, Hargrove contends that "it is very likely that the attacker left his DNA on her underwear, even if not seminal fluid or sperm."  But Woolridge did not expressly allege that her attacker directly *touched* her underwear.  Indeed, the Commonwealth reads Woolridge's testimony to mean that the assailant "succeeded in pulling her pants, shorts, and underwear down, apparently all at once, halfway to her knees."  In other words, to the extent that Woolridge's attacker touched the underwear, he may have done so only indirectly by grabbing Woolridge's pants and pulling the underwear down through the pants.  With no other testimony or evidence on this point, we hesitate to place significant weight on the test results because it is unclear from Woolridge's account whether her attacker physically touched her underwear.

Additionally, even if the testimony established that Hargrove touched the underwear, it is not necessarily true that he would have left behind DNA.  *See* David L. Faigman et al., Modern Scientific Evidence: The Law and Science of Expert Testimony § 30:15 (2024-2025 ed.) (explaining that an individual can handle an item without transferring detectable DNA and that factors like age, skin conditions, sex, and "shedder" status may affect transfer rates); *see also State v. Dawson*, 263 A.3d 779, 789 (Conn. 2021) (acknowledging that DNA is not always detectable after someone touches an object).

It is also entirely plausible that the DNA was transferred to the underwear before or after the rape. As noted earlier, SERI identified three contributors to the underwear DNA sample. Assuming that Woolridge is one of the three, the other two are unknown. The Commonwealth correctly notes that Woolridge lived with her father at the time of the assault and had a fiancé. This leaves open the possibility that her father could have deposited his DNA while doing laundry, for example, or that her fiancé came into contact with the underwear at some point. The record also reflects that a male physician conducted the PERK kit (although it is unclear if he personally handled the underwear). All of these males were presumably in proximity to Woolridge around the time of the attack, yet none have been ruled out as possible DNA contributors.

Our discussion of the limited insights provided by these DNA test results should not be construed as barring "Touch DNA" from all actual innocence proceedings. But here, the link between the DNA sample and the rape is tenuous. There are a plethora of possibilities about who contributed the DNA and when and how they did so. This stands in contrast to other cases where the connection between the biological evidence and the criminal offense was concrete. In *Scott*, for example, we granted a writ of actual innocence where one individual assaulted a rape victim and DNA testing revealed that the petitioner was not a match to sperm samples recovered from the victim's jeans. 297 Va. at 187-90. And in *Watford*, we explained that DNA profiles taken from a mattress in a rape case could not be conclusively associated with the offense because other consensual sexual encounters may have occurred on the mattress, which was in a vacant house; thus, "any conclusions derived from these DNA profiles would be entirely speculative and, as such, deserve no weight." 295 Va. at 127 n.18.

Next, we note that the SERI testing results do not entirely exonerate Hargrove.

22

An entire portion of the underwear–the crotch area–was not tested due to concerns about the overwhelming presence of Woolridge's DNA. Nothing in the record shows that further testing of the crotch area was ordered after this information was provided to Hargrove's defense counsel.[19]

Hargrove also offers little information to sufficiently contextualize the results and explain how a "weak and incomplete" DNA mixture from the underwear impacts the probative value of the test results. In response to the Commonwealth's objections to exoneration based on a "weak and incomplete" DNA sample, Hargrove asserts that a "weak and incomplete" DNA profile can, in fact, yield exculpating results and that "[a] partial (or 'incomplete') profile can definitively exclude an individual as a contributor, given that it only requires a non-match at one locus." And at oral argument, Hargrove's counsel explained that the "weak and incomplete" label just means that the sample is old and "there is not a lot of it," which is often true of the evidence in "actual innocence" cases.

The quality and quantity of the underlying evidence is critical for properly assessing the significance of new DNA testing. DNA degrades over time. *Brown*, 295 Va. at 220, n.19. And the amount of DNA tested correlates to the probative weight of the evidence such that test results based on "a low amount" of DNA may have little probative value. *Id.* at 231. Indeed, low amounts of DNA and sensitive testing methods are associated with an increased risk of contamination and "potential secondary or tertiary transfer." *Id.* at 232-33; *see also District*

---

[19] To be sure, Hargrove notes in his petition that DLI tested the underwear and did not find male DNA on the "staining on the interior crotch region." But after SERI utilized advanced M-Vac technology to collect DNA from the underwear and Gary Harmor identified the difficulties of testing the crotch area, the record does not show whether Hargrove's counsel inquired into the feasibility of Y-STR testing of the crotch area even if STR testing was not feasible. Moreover, it is not apparent why SERI and DLI had diverging approaches to testing the crotch area (DLI tested it, while SERI—with a more advanced methodology—did not).

*Attorney's Office for the Third Jud. Dist. v. Osborne*, 557 U.S. 52, 82 (2009) (Alito, J.,

concurring) (explaining that "modern DNA testing technology is so powerful that it actually

increases the risks associated with mishandling evidence"); *Wakeman v. Commonwealth,* 69 Va.

App. 528, 534 (2018) (noting that "touch DNA" may be "transferred by contact that can include

two people in the same household using the same bathroom or by two people sequentially

placing their hands in the same place."). In a case like this—where the biological evidence is

decades-old and degraded[20]—a "weak and incomplete" DNA sample is not exculpatory on its

own. Certainly, Hargrove provides no expert affidavit or other evidence to explain how the

sample's "weak and incomplete" nature, along with the quality of the underwear, the amounts of

DNA collected, and the age of the evidence, may affect the results' probative weight.[21]

Lastly, the lack of physical evidence connecting Hargrove to the attack is unremarkable

because the jury could not have convicted Hargrove based on physical evidence. At trial, the

parties stipulated that no foreign hairs were found and that the absence of spermatozoa, seminal

fluid, and foreign hair prevented further laboratory tests to determine the offender's identity.

Woolridge's testimony and identification of Hargrove was the core of the prosecution's case. As

this Court has noted, "the victim's testimony alone, if not inherently incredible, is sufficient to

support a conviction for rape." *Nobrega v. Commonwealth*, 271 Va. 508, 519 (2006); *see also*

*Fisher v. Commonwealth*, 228 Va. 296, 299 (1984).

---

[20] After the circuit court authorized the testing, Hargrove filed a supplemental motion for additional funding after Harmor "indicated that the age/degradation of the victim's underwear sample may make it difficult to extract sufficient male DNA to obtain meaningful results." SERI ultimately collected a DNA mixture from parts of the underwear. Even so, the motion underscores that the condition of the underwear had degraded over time.

[21] By contrast, the petitioner in *Scott* supported his petition with affidavits and other exhibits that provided relevant perspectives from analysts who either performed testing in his case or reviewed the test results. 297 Va. at 179-82.

Even if a rational fact finder were presented with the entirety of the evidence, including the new DNA testing results with all the caveats noted above, that fact finder would not necessarily have concluded that Woolridge misidentified Hargrove as her attacker. A rational fact finder would still be able to find that Woolridge correctly identified Hargrove after seeing him in broad daylight over the course of 45 minutes and never wavering in her identification. This holds true even under Hargrove's "preponderance of the evidence" burden because the new DNA evidence has limited probative value.

**B. Non-biological Evidence**

Hargrove also presents various non-biological evidence to undercut Woolridge's credibility. But, as discussed below, none of this evidence establishes whether Woolridge was affected by any condition that impaired her memory. And studies about eyewitness testimony and the effects of diabetes do not establish that Woolridge herself misremembered her rape or misidentified Hargrove. This evidence is, at best, speculative, and entitled to no weight.

*1. Authority to Consider Non-biological Evidence*

The statutes and relevant case law are not entirely clear on whether this information may be presented to this Court in a petition for a writ of actual innocence based on biological evidence. Code § 19.2-327.2.

The Commonwealth contends that this Court cannot consider non-biological evidence under Virginia's actual innocence statutes. Sections 19.2-327.2 and 237.3 refer to a writ of actual innocence based on "biological evidence," and the statute governing a writ of actual innocence based on "nonbiological evidence"—which is issued by the Court of Appeals—provides that "[h]uman biological evidence may not be used as the sole basis for seeking relief under this writ but may be used in conjunction with other evidence." Code § 19.2-327.11. Citing to these

25

statutory provisions, the Commonwealth argues that this Court's review of a petition for actual innocence based on biological evidence is limited to the biological evidence presented therein. An implication of this position is that a petition presenting a mixed basis for relief—that is, both biological and non-biological evidence—should be brought in the Court of Appeals.

Hargrove argues that this Court can consider non-biological evidence in the instant proceedings. He cites *In re Watford*, where we found that the petitioner's new DNA evidence, by itself, would not have supported granting a writ of actual innocence for a rape conviction but still granted a writ based on evidence adduced at an evidentiary hearing where, among other things, the victim testified she never saw the petitioner on the day of the attack. 295 Va. at 127-29. But *Watford* is not directly applicable to the instant circumstances.

In *Watford*, we noted that Code § 19.2-327.5 requires this Court to consider what amounts to a "totality of the evidence" when considering the factors enumerated in Code § 19.2-327.5. *Id*. at 125. We quoted from this section of the code, which requires this Court to consider:

> [T]he petition, the response by the Commonwealth, previous records of the case, the record of any hearing held under this chapter and the record of any hearings held pursuant to § 19.2-327.1 [statute governing motions for scientific analysis of newly discovered or previously untested evidence], and if applicable, any findings certified from the circuit court pursuant to § 19.2-327.4[.]

Code § 19.2-327.5. We then paraphrased these requirements to explain that

> In other words, the statute effectively requires us to draw our conclusion from a hypothetical new trial in which a rational factfinder hears all of the evidence in the aggregate, including: any records from the original case, the evidence presented at the original trial, the newly discovered biological evidence, *any additional factual proffers made by the petitioner* or the

26

> Commonwealth, and the evidence adduced at the evidentiary
> hearing held pursuant to Code § 19.2-327.4.

295 Va. at 125 (emphasis in original omitted, italics added). We later quoted this passage in

*Scott*, 297 Va. at 185-86. Hargrove relies on our case law's references to a petitioner's proffers to

contend that this Court can, in fact, consider non-biological evidence.

It is an overstatement to suggest that our precedents hold that each and every piece of

information proffered by a petitioner may be properly considered so long as it is presented in a

petition centered upon DNA evidence. Code § 19.2-327.5 frames our inquiry. It directs that the

"petition" must be considered, but it does not definitively state whether non-biological evidence

may be presented in a petition styled as one based on biological evidence. And *Watford* relied on

evidence that is expressly listed in Code § 19.2-327.5: "findings certified from the circuit court

pursuant to § 19.2-327.4." 295 Va. at 128-29. Thus, while the testimony provided at the *Watford*

evidentiary hearing was non-biological in nature, it squarely fell within the kind of evidence this

Court may properly consider under Code § 19.2-327.5. By contrast, no such circuit court

findings have been issued with respect to Hargrove's petition.

For the purposes of today's decision, we need not determine the precise contours of

actual innocence petitions based on biological evidence. Assuming without deciding that this

Court may consider Hargrove's non-biological evidence, he does not meet his burden.

### 2. *Ex-husband's Declaration and Scientific Studies*

In support of his petition, Hargrove has produced a declaration from Jesse Frank

Humphrey, Jr., Woolridge's ex-husband.[22] Humphrey alleges, among other things, that his wife

suffered from poorly managed diabetes and that she was "frequently hospitalized." He also

---

[22] Humphrey and Woolridge married the month after Hargrove's criminal trial and the couple divorced about three years later.

claims that various cognitive and mental health issues affected Woolridge. He alleges that she "often had trouble remembering things" and was "extremely quick to anger," "erratic," and "emotionally unstable." Humphrey contends that he "was never sure when [Woolridge] was being honest" such that "eventually all the trust was gone."

According to Hargrove, Humphrey's declaration undermines Woolridge's credibility because it shows that her "physical and mental condition were unstable during the relevant time period." Hargrove links Humphrey's allegations about Woolridge to studies showing that "[u]ncontrolled blood sugar can affect brain functioning, including memory and attention span" and that diabetic individuals have higher risk of "cognitive complications." Thus, Hargrove asserts that "[c]omplications from [Woolridge's] medical condition may have impaired her reliability and credibility."

Additionally, Hargrove cites various studies and other literature about the fallibility of eyewitness testimony, particularly from witnesses who experience high levels of stress. He suggests that if an expert had testified at his trial about "the pitfalls in eyewitness testimony" it would have "significantly undermined" Woolridge's testimony.

Even if Code § 19.2-327.11's requirements for petitions based on non-biological evidence would apply to Hargrove's proffered non-biological evidence, we note that a petitioner must show, by a preponderance of the evidence,[23] "that the previously unknown, unavailable, or untested evidence is not merely cumulative, corroborative, or collateral."

Here, Humphrey's declaration and the cited scientific studies are collateral because they do not make it more or less likely that Woolridge accurately identified Hargrove as her attacker.

_____

[23] Code § 19.2-327.13 supplies the "preponderance of the evidence" burden that applies to petitions based on non-biological evidence.

28

*See Seilheimer v. Melville*, 224 Va. 323, 327 (1982) (explaining that a collateral fact is one "from which no fair inferences can be drawn tending to throw light upon the particular fact under investigation" and "is properly excluded for the reason that such evidence tends to draw the minds of the jury away from the point in issue, to excite prejudice and mislead them." (quoting *Spurlin, Administratrix v. Richardson*, 203 Va. 984, 990 (1962))).

Humphrey's allegations about Woolridge's physical and mental wellbeing lack any temporal connection to her health at the time of the assault in June 1990, Hargrove's arrest in May 1991, or the trial in July 1991. Humphrey does not specify precisely when most of Woolridge's allegedly erratic behavior even occurred.[24] Some of the conduct appears to have happened during the couple's marriage, which began after the trial. And even if Woolridge suffered from certain issues during or after their marriage, that does not mean such conditions necessarily affected her during the events relevant to this case. Humphrey's declaration does not make Woolridge's account more or less likely.[25]

---

[24] Although not expressly about Woolridge's health, Humphrey alleges that Woolridge did not tell him about the rape until shortly before the day that she spotted Hargrove outside Humphrey's apartment building. Humphrey apparently thought the rape occurred on the date that Woolridge disclosed it to him, which would have been close to a year after the attack. But the details Humphrey recalls Woolridge sharing with him are consistent with her trial testimony. ("She said that it happened while she was crossing the field behind Mosby Middle School. She told me that a man had come up behind her, dragged her across the field and into the woods and then raped her.") Woolridge's purported omissions, like a failure to "mention anything [to Humphrey] about her attacker or what he looked like" or "whether he had a weapon," and her delay in sharing her account with him, has no bearing on whether the assault occurred and whether her identification of Hargrove was accurate. Neither Humphrey's declaration nor Hargrove's briefs acknowledge that Woolridge may have felt uncomfortable discussing her rape immediately after it occurred or recounting specific details about it when she eventually chose to talk about it.

[25] Even though we evaluate Humphrey's declaration in the context of this petition, it should not be assumed that we countenance it. Impugning the integrity of a rape victim posthumously through the declaration of her divorced ex-husband in the manner presented

The scientific studies about the cognitive effects of diabetes and the accuracy of eyewitness testimony are likewise collateral.  Hargrove provides no medical evidence or expert opinions that specifically relate to Woolridge's health conditions.  Hargrove's argument is, in essence, that scientific literature about the cognitive health of diabetic individuals and the accuracy of eyewitness testimony necessarily casts doubt on Woolridge's testimony because she was diabetic and the sole witness to her rape.  But generalized concerns raised by these studies do not make the facts in this case more or less likely.  Without any demonstrably accurate information about Woolridge's medical condition at the time of her attack, her identification of Hargrove, or her trial testimony, Hargrove's assertion that Woolridge's "physical and mental condition were unstable during the relevant time period" is pure speculation.

In sum, the non-biological evidence presented in Hargrove's petition largely appears aimed at relitigating Woolridge's credibility.  But none of it shows that Woolridge, in fact, suffered from memory lapses or was otherwise impaired at critical moments in this case.  Thus, Hargrove has failed to prove, by a preponderance of the evidence, that this evidence is not collateral.  *See* Code §§ 19.2-327.11(A)(vii), 19.2-327.13.  As such, it receives no weight in our analysis.

C. **Purported Flaws and Inconsistencies in Woolridge's Testimony**

Hargrove also calls attention to purported "indicia of unreliability" in Woolridge's trial testimony.  But he does not show that these issues were unknown at the time of trial.  And nor could he.  Indeed, Hargrove's trial counsel questioned Woolridge about several aspects of her account that Hargrove tries to revisit in his petition.  For instance, Hargrove makes much of

_____

strikes us, from an evidentiary perspective, as paltry and actually illustrative of the legal limitations in this petition.

30

Woolridge's testimony that she initially thought her assailant could have been the brother of an acquaintance but did not mention her suspicion to police and later abandoned the theory after talking about it with a friend. But Hargrove fails to consider that a jury could have believed that detail *bolstered* Woolridge's credibility, showing her attempt to corroborate her suspicions before making a formal accusation.

We decline to reweigh various aspects of Woolridge's trial testimony just because, from Hargrove's perspective, his trial counsel could have possibly subjected Woolridge to a stronger cross-examination. Virginia's actual innocence statutes plainly contemplate that a petition will be based on previously unknown, unavailable, or untested evidence that, when viewed in the context of the entire record, shows by a preponderance of the evidence that no rational factfinder would have found proof of guilt beyond a reasonable doubt. *See* Code §§ 19.2-327.5, 19.2-327.13. Given the statutes' emphasis on the timing of when evidence became available relative to trial proceedings, an actual innocence petition is not a vehicle to merely relitigate credibility issues through evidence and arguments originally available at trial.

Of course, the trial evidence must be considered alongside with the newly adduced evidence. And "[t]his admixture of old and new evidence necessarily means that the petitioner and the Commonwealth are free to assert their respective theories of innocence or guilt that correspond to their competing versions of the aggregate fact pattern." *Brown*, 295 Va. at 229. But Hargrove's theory of innocence carries little persuasive force when, as here, the new evidence has low or no probative value. When Hargrove's petition—including the DNA testing, the collateral non-biological evidence, and the purported inconsistencies in Woolridge's testimony—is considered alongside the entire record, he presents, at most, a "theoretical

31

possibility that a rational fact finder would choose to acquit." *Watford*, 295 Va. at 124.  That is not enough.  *Id.*

## IV.  CONCLUSION

For the foregoing reasons, Hargrove fails to show, by a preponderance of the evidence, that no rational factfinder would have found him guilty of the offenses against Woolridge. Accordingly, the Commonwealth's motion to dismiss is granted and Hargrove's petition is dismissed.

*Petition dismissed.*